UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DONTA JENKINS,

        Plaintiff,

    v.                          Case No. 18-C-1874

LT. SANCHEZ, et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Donta Jenkins, who was serving a state prison sentence at Waupun Correctional Institution at the time of filing but has since been released, filed this *pro se* action pursuant to 42 U.S.C. § 1983, alleging Defendants Jennifer Kacyon, Mark Jensen, Nicholas Sanchez, Thomas Nelson, Craig Theander, Andrew Pohl, Jonathon Kobza, John Birdyshaw, Jamie Engstrom, and Joshua Adderton violated his constitutional rights. More specifically, Jenkins alleges Sanchez, Kobza, and Pohl used excessive force against him; Nelson failed to intervene; Adderton and Birdyshaw were deliberately indifferent to his threats of self-harm; and Nurse Kacyon, Dr. Engstrom, Nurse Jensen, and Captain Theander were deliberately indifferent to his medical needs. This matter comes before the court on the defendants' motion for summary judgment. For the following reasons, the motion will be partially granted.

## PRELIMINARY MATTERS

Before turning to the substance of the parties' arguments, the court must address certain preliminary matters. The defendants assert that their proposed findings of fact must be deemed admitted as uncontroverted for the purposes of summary judgment because Jenkins failed to properly respond to them in accordance with Civil Local Rule 56. Pursuant to the local rules,

along with the motion for summary judgment, the moving party is required to file either a statement of material facts to which the parties have stipulated or a statement of proposed material facts as to which the moving party contends there is no material issue and that entitle it to judgment as a matter of law. Civil L.R. 56(b)(1). The statement of proposed findings of fact is comprised of numbered paragraphs containing short factual statements and specific references to affidavits, declarations, parts of the record, and other supporting materials. Civil L.R. 56(b)(1)(C). The defendants in this case submitted proposed findings of fact in support of their motion for summary judgment in compliance with the local rules. Dkt. No. 54.

The party opposing the motion must file a response to the moving party's statement of undisputed facts which is intended to make clear which, if any, of those facts are in dispute, and to set forth any additional facts that bear on the motion. The opposing party's response must reproduce each numbered paragraph of the moving party's statement of facts followed by a response to each paragraph. Civil L.R. 56(b)(2)(B). If the fact is disputed, the party must include a specific reference to an affidavit, declaration, or other part of the record that supports the claim that a genuine dispute exists as to the fact stated by the moving party. *Id.* If the opposing party believes there are additional facts that prevent the entry of summary judgment, he should include a statement, consisting of short numbered paragraphs that set forth each additional fact and include references to the affidavits, declarations, or other parts of the record that support the assertion. Civil L.R. 56(b)(2)(B)(ii). The defendants, as required by this court's local rules, included a copy of Federal Rule of Civil Procedure 56, Civil Local Rule 7, and Civil Local Rule 56 in their motion for summary judgment. Jenkins responded to the defendants' proposed findings of fact, but some of his responses do not cite to an affidavit, declaration, or other part of the record. Jenkins received proper notice detailing how to respond to the defendant's proposed findings of fact in compliance

2

with the court's local rules. As a result, the court will only consider those responses that are properly supported by the record and comply with the local rules.

Jenkins also submitted a "Response to Defendants' Brief in Support of Their Motion for Summary Judgment" that contains 119 paragraphs that appear to be additional proposed findings of fact. Though Jenkins signed his response under penalty of perjury, citing 28 U.S.C. § 1746, Jenkins' response does not comply with the court's local rules. Therefore, the court will not consider Jenkins' additional facts. *See* Civil L.R. 56(b)(4); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("We have . . . repeatedly upheld the strict enforcement of [local] rules, sustaining the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts."); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809–10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with [the local rules], the court chooses to ignore and not consider the additional facts that a litigant has proposed."); *Hinterberger v. City of Indianapolis*, 966 F.3d 523 (7th Cir. 2020). With these considerations in mind, the court now turns to the instant motion.

## BACKGROUND

Jenkins was an inmate at Waupun Correctional Institution at all times relevant to this lawsuit. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1. Defendant Sanchez was a lieutenant at Waupun and worked from 1:30 p.m. to 10:00 p.m. *Id.* ¶ 2. Defendant Thomas Nelson is a lieutenant at Waupun, who was assigned to the Restrictive Housing Unit (RHU). *Id.* ¶ 3. Defendant Theander was a Captain at Waupun. *Id.* ¶ 4. Defendants Joshua Adderton, Jonathan Kobza, and Andrew Pohl were correctional officers at Waupun. They were assigned to RHU where Jenkins was housed, working second shift from 2:00 p.m. to 10:00 p.m. *Id.* ¶ 5. Defendant John Birdyshaw, a correctional officer at Waupun, began work at 2:00 p.m. *Id.* ¶ 6. Defendant

Jennifer Kacyon is a Nurse Clinician II at Waupun. She worked from 1:15 p.m. until 1:00 a.m.; however, her patient care duties ended at 9:30 p.m. *Id.* ¶ 9. Defendant Mark Jensen was a Nurse Clinician II at Waupun. He came on duty at 9:30 p.m. and worked through 8:05 a.m. *Id.* ¶ 10. Defendant Engstrom was a Psychological Associate at Waupun. *Id.* ¶ 11.

On September 18, 2018, Jenkins was placed in clinical observation status. *Id.* ¶ 13. Clinical observation status is a non-punitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or others. Inmates on clinical observation are checked on in intervals not to exceed 15 minutes. *Id.* ¶ 14. Birdyshaw conducted 15-minute checks of Jenkins on September 18, 2018, but he was off-site and not responsible for conducting any of the 15-minute checks of Jenkins in clinical observation on September 19, 2018. *Id.* ¶ 15. Adderton was not responsible for conducting any of the 15-minute checks of Jenkins in observation on September 19, 2018. *Id.* ¶ 16.

On September 19, 2018, Jenkins engaged in self-harm by biting his arm near his bicep. *Id.* ¶ 18. Around 4:10 p.m., Officer Phillips discovered Jenkins in his cell bleeding after committing self-harm and asked Sgt. Fisher for assistance. Sgt. Fisher asked Adderton to bring restraints to Jenkins' cell and assist in escorting Jenkins to the nurse's station in RHU. *Id.* ¶ 19. Jenkins was secured in handcuffs and leg irons. *Id.* ¶ 20. Nurse Kacyon reported to RHU and determined Jenkins should be brought to the Health Services Unit (HSU) for further treatment. Officers switched Jenkins' cuffs from behind his back to in front, and his hands were secured in front of him and belted to his waist. *Id.* ¶¶ 21–22.

Jenkins walked out of the observation cell, down the stairs, across the dayroom, and down the HSU hallway in the leg irons. *Id.* ¶ 25. Adderton and Fisher escorted Jenkins with Jenkins walking between them to HSU with no incident. Jenkins was able to walk with his leg shackles on and did not complain of any discomfort or pain. *Id.* ¶ 26. A hallway security camera recorded

4

the end of Jenkins' escort from RHU to the HSU treatment room. Adderton secured Jenkins' right arm, applying pressure to the wound, Fisher secured his left arm, and Kacyon walked behind Jenkins. *Id.* ¶ 27. At HSU, Dr. Manlove assessed Jenkins' injury and closed his wound with stitches. *Id.* ¶ 28. While in the HSU treatment room, Jenkins continued to wear the wrist and leg irons. *Id.* ¶ 29. Before Jenkins left HSU, Sanchez came to HSU and relieved Sgt. Fisher back to his duties. *Id.* ¶ 30. Jenkins was told that he would be escorted from HSU to an RHU strip cell and that PSU would be notified. *Id.* ¶ 31.

A hallway security camera recorded the beginning of Jenkins' escort from HSU to RHU. Sergeant Steekstra secured Jenkins' left arm, Adderton secured his right arm, and Sanchez walked behind Jenkins. *Id.* ¶ 32. Jenkins stated that he would not walk and stopped his movement. Sanchez directed Jenkins to continue to walk to RHU. *Id.* ¶ 33. Jenkins used dead weight tactics, dropping to his knees and forcing staff to hold all of his body weight. *Id.* ¶ 34. When inmates are disruptive, staff are trained to escort inmates backwards to the desired location. *Id.* ¶ 35. Sanchez maintained control of Jenkins' head during the escort to prevent possible injury to Jenkins or staff using a technique in which one bladed hand was placed over Jenkins' forehead and another bladed hand on his chin area. *Id.* ¶ 36. Sanchez again directed Jenkins to walk, but Jenkins refused to comply. Sanchez then used a compliance hold by applying pressure under Jenkins' jaw line in an upward motion. *Id.* ¶ 37. Jenkins complied with Sanchez's directives to walk. *Id.* ¶ 38. Sanchez returned his hands to the escort hold position (one hand on the forehead and one on the chin) and continued the escort hold and instructed staff to walk Jenkins backwards to RHU. *Id.* ¶ 39.

In the hallway to RHU, Jenkins again used dead weight tactics. Sanchez directed staff to stop and used a compliance hold, applying pressure under Jenkins' chin, in an upward motion, while verbalizing "walk." Jenkins stood up and began walking. Sanchez then released the compliance hold and secured Jenkins' head. *Id.* ¶ 40. As Jenkins and staff neared the RHU sally

5

port, Jenkins began tensing. *Id.* ¶ 41. Sanchez directed Jenkins to stop resisting then put Jenkins in a compliance hold and applied pressure under Jenkins' jaw line in an upward motion. *Id.* ¶ 42. Nelson and Pohl heard a commotion near the HSU entrance to RHU. They saw Kacyon banging on the window and waving for assistance. *Id.* ¶ 43. Nelson, Pohl, and Kobza arrived to lend assistance to Steekstra, Adderton, and Sanchez. *Id.* ¶ 44. Jenkins continued to ignore directives to comply and to stop resisting. *Id.* ¶ 45. Nelson placed his X-26P Taser on Jenkins' right shoulder, with the cartridge removed as an indicator that he would use the taser if Jenkins did not comply. Nelson told Jenkins to "stop." Jenkins immediately complied. The Taser was not deployed. *Id.* ¶ 46.

Once in RHU, Jenkins again used dead weight tactics and refused to walk. Sanchez applied a compliance hold while telling Jenkins to stand up and walk several times. Jenkins initially refused but eventually complied and stood up. Sanchez released the compliance hold and secured Jenkins' chin. *Id.* ¶ 48. Pohl relieved Steekstra and took over securing Jenkins' left arm. *Id.* ¶ 50. Jenkins was escorted backwards to the strip cell and secured to the strip cell door. *Id.* ¶ 51. Once a tether strap was applied, Sanchez directed Kobza to relieve him in securing Jenkins' head. Kobza secured Jenkins' head, using a trained technique by applying a bladed hand to Jenkins' forehead and a bladed hand to his chin. DPFOF ¶ 52. While Jenkins was secured at the strip cell door, Sanchez told Kacyon that Jenkins appeared to be bleeding and asked if Kacyon would like to conduct a medical assessment. Kacyon stated that she would. *Id.* ¶ 54. Sanchez decided that, due to Jenkins' noncompliance, Jenkins needed to be placed in a restraint chair before the nurse could safely evaluate his wound. *Id.* ¶ 55.

Sanchez removed the tether strap from Jenkins' wrist so that he could be moved to the restraint chair, and staff assisted Jenkins into the restraint chair. *Id.* ¶ 58. Staff applied restraints to Jenkins' chest, at the waist, and on the ankles. Sanchez decided to place a spit mask on Jenkins

6

for the safety of staff around him. Sanchez properly applied the spit mask to Jenkins. *Id.* ¶ 59. Kacyon medically assessed Jenkins. *Id.* ¶ 60. She removed the saturated dressing, observed that the sutures remained intact, and applied a fresh dressing and compression wrap. *Id.* ¶ 63. Staff wheeled Jenkins in the restraint chair into a strip cell. *Id.* ¶ 64.

Sanchez contacted Engstrom at approximately 5:15. As a PSU staff member, Engstrom has the authority to determine if a placement in clinical observation or restraints is appropriate. *Id.* ¶ 67. Sanchez told Engstrom that Jenkins had bit into his arm and was continuing to threaten self-harm. He explained that Jenkins was currently in a restraint chair due to his aggression and noncompliance with staff, and was secured in a cell to have time to settle down. *Id.* ¶ 69. Given the nature of Jenkins' self-harm actions, continued threats of self-harm, and noncompliance with staff, Engstrom determined that not restraining Jenkins would likely lead to additional injury and advised staff to place Jenkins in Grip bed restraints. *Id.* ¶ 70. The Grip bed restraint system uses flexible seatbelt-like straps that eliminate metal to skin contact with secure locks that open with a standard handcuff key. *Id.* ¶ 71.

Sanchez directed staff to don personal protective equipment to move Jenkins to a bed restraint. *Id.* ¶ 73. Sanchez also notified the assistant director of operations, Warden Brian Foster, of the situation. *Id.* When an inmate transfers statuses within RHU, he must undergo a strip search before he is placed in the cell. *Id.* ¶ 74. Due to Jenkins' continued noncompliance throughout the escort and his threats to harm himself if he was out of restraints, the decision was made to conduct a staff-assisted strip search, regardless of whether Jenkins said he would comply. *Id.* ¶ 77. Sanchez notified Jenkins that a staff-assisted strip search would be conducted, which was necessary due to Jenkins' expression of self-harm, and staff had to confirm that Jenkins was not carrying or concealing any contraband that could be used to harm himself or others. *Id.* ¶ 79. Sanchez also

7

informed Jenkins of Engstrom's decision to place him in bed restraints for his safety and identified the staff members who would be involved. *Id.* ¶ 80.

Staff removed Jenkins from the chair restraints. Sanchez supervised the strip search conducted by Pohl. Pohl verbalized every step clearly to Jenkins while Uherka and Birdyshaw held onto Jenkins' arms. Kobza was present for additional security if needed. Nelson operated a video camera to record the staff-assisted strip search. *Id.* ¶ 81. Jenkins was assisted to a standing position and secured to the door utilizing a short tether strap to maintain control of Jenkins during the search. *Id.* ¶ 82. Pohl removed the privacy kilt and began the search with Jenkins' hair, behind his ears, within his mouth, and his armpits. Pohl searched his buttocks using bladed hands. *Id.* ¶ 83. The defendants assert that Pohl used the back of his bladed hand to lift Jenkins' penis and scrotum. Jenkins turned his head and pulled away, and he was stabilized to the door. *Id.* ¶ 84. According to Jenkins, Pohl squeezed his scrotum and penis, causing him to move from the unwanted pain and discomfort. Pl.'s Resp. to DPFOF ¶ 84, Dkt. No. 68. While staff secured Jenkins to the door, Sanchez gave him verbal directives to cooperate with the search. Jenkins complied, and Pohl used bladed hands to lift Jenkins' penis and scrotum. Pohl searched Jenkins' feet and placed a privacy wrap around Jenkins' waist. DPFOF ¶ 85.

Jenkins was escorted to a cell to be placed in bed restraints. Staff assisted him onto the bed and into the proper position to have the restraints applied. *Id.* ¶ 86. Security staff applied the bed restraints. *Id.* ¶ 87. After staff secured the straps, Sanchez checked the placement of all straps by inserting a finger underneath the straps to ensure the straps were not too tight. *Id.* ¶ 88. Kacyon conducted a medical assessment, including respiration, pulse, and circulation checks. She medically cleared Jenkins to remain in the cell. *Id.* ¶ 89. Kacyon also checked the restraints for fit. In the process, adjustments were made to the chest strap. The restraint was checked again for placement and fit. *Id.* ¶ 90.

8

Sanchez offered Jenkins a urinal, water, and a meal supplement. Jenkins stated he was on a hunger strike. Sanchez again asked Jenkins if he wanted a urinal, water, and meal supplement, but Jenkins did not respond to this question. Sanchez understood this to be a rejection by Jenkins. *Id.* ¶ 92. In the course of this process, Jenkins' waist belt, handcuffs, and spit mask were removed. *Id.* ¶ 93. Staff departed the cell at approximately 6:10 p.m. *Id.* ¶ 94. At 6:26 p.m., Engstrom met with Jenkins to conduct an initial assessment and explain why he was placed in restraints. *Id.* ¶ 96.

Staff visually check on inmates in bed restraints at least every 15 minutes to make sure they are not in distress. *Id.* ¶ 97. When an inmate is placed in bed restraints, he is offered the use of a urinal and water every two hours. In addition, the restraint straps are checked to ensure they have not loosened. *Id.* ¶ 98. The observation log reflects that Jenkins was observed to be able to speak and breathe normally and make eye contact with staff after his placement in restraints. During the security check at 8:15 p.m., there were no adjustments made to Jenkins' restraints. At that time, Jenkins was talking and breathing and did not express any concerns. Jenkins expressed a need to defecate, so Sanchez went to get a bed pan. *Id.* ¶ 103. Jenkins was offered a bed pan at approximately 8:30 p.m. *Id.* ¶ 104. The first time he was offered a urinal, Jenkins admits he could not go at that time. *Id.* ¶ 105. Jenkins attempted to defecate but was unsuccessful. He claims he would have liked to wipe his rear end after the effort. *Id.* ¶ 106.

Kacyon's shift ended at 9:30 p.m. and patient care responsibilities transferred to RN Jensen. DPFOF ¶ 108. Sanchez finished his shift at 10:00 p.m. before the next time a urinal was scheduled to be offered to Jenkins. *Id.* ¶ 109. Sometime during the next two hours, Jenkins urinated on himself. *Id.* ¶ 110.

Nurse Jensen conducted a medical assessment at approximately 10:45 p.m. and again at 2:40 p.m. Jensen offered and Jenkins accepted a range of motion check each time. *Id.* ¶ 112. During the first health check at 10:45 p.m., Jenkins complained of pain in his arm straps. Jensen

9

checked the straps but observed no redness or pinching. *Id.* ¶ 113. During the 2:40 a.m. health check on September 20, 2019, Jensen again checked the restraints and they were placed and fit appropriately. *Id.* ¶ 114.

At 4:24 a.m., security staff called Engstrom and described Jenkins' current behavior. He was compliant during reevaluation and range of motion sessions. He also denied further plans to harm himself. Based on security's report, Engstrom instructed staff to release Jenkins from protective restraints. *Id.* ¶ 115. At 4:30 a.m., staff removed Jenkins from the bed restraints. Staff explained to Jenkins what they were going to do, directed Jenkins to follow commands, and advised that staff would slowly assist him up. *Id.* ¶ 116. As staff released the restraint from his left arm, Jenkins complained of his pain and cried that his skin was ripped. There was a slight indentation noted from the restraint strap but no real injury noted. *Id.* ¶ 118. Staff removed the remainder of the bed restraints, secured Jenkins with wrist and ankle cuffs, assisted him into a sitting and then standing position, and asked whether he felt dizzy or needed to take it more slowly. *Id.* ¶ 119. Jenkins was escorted to the strip cell and secured within it without incident. *Id.* ¶ 120. Because Jenkins complained about his arm, the security staff asked if he wanted to see a nurse. Jenkins said he did and the staff contacted HSU to have a nurse evaluate Jenkins. *Id.* ¶ 121.

PSU directed that Jenkins remain on observation status because of his self-harm incident. It determined that Jenkins could have a mat and kilt for privacy. *Id.* ¶ 122. Staff gave Jenkins body wipes so that he could wash himself and cleaned the mat he was to be given. *Id.* ¶ 123. Jensen assessed Jenkins at the strip cell door. Jensen noted Jenkins had some type of abrasions. Jensen told Jenkins that, when he had checked Jenkins' restraints overnight, he was able to place two fingers underneath the strap, meaning that the straps were not too tight. Jensen offered to clean Jenkins' arm, and Jenkins agreed. *Id.* ¶ 124. After giving Jenkins a fresh kilt, staff escorted Jenkins to the HSU in RHU. *Id.* ¶ 125. Jensen again evaluated Jenkins. He noted that Jenkins

10

was oriented and able to follow commands, his breathing was steady, and his blood pressure was within normal range. *Id.* ¶ 126. Jensen observed abrasions on Jenkins' arms consistent with the restraint straps. Jenkins' sutures remained intact. Jensen cleaned the area and applied a gauze dressing. *Id.* ¶ 127. After receiving medical treatment, Jenkins was secured in a cell in observation status with a mat and kilt for privacy. *Id.* ¶ 129.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the

11

facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Id.* at 378–81. Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Failure to Exhaust Administrative Remedies

The defendants assert that Jenkins has failed to exhaust his administrative remedies for his claim that Adderton and Birdyshaw were deliberately indifferent to his threats of self-harm. The PLRA provides that an inmate cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(1); *see also Woodford v. Ngo*, 548 U.S. 1, 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). A plaintiff's failure to properly exhaust each step of the administrative process constitutes a failure to exhaust available administrative remedies. *Id.* The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 526, 532 (2002). The purpose of § 1997e(a) is to "permit the prison's administrative process to run its course before litigation begins." *Dole v. Chandler*, 438 F.3d 804,

809 (7th Cir. 2006) (quoting *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005)); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Wisconsin has implemented the Inmate Complaint Review System (ICRS) under which inmate grievances concerning prison conditions or the actions of prison officials are "expeditiously raised, investigated, and decided." Wis. Admin. Code § DOC 310.01. Under the ICRS, an inmate must file a complaint with the institutional complaint examiner (ICE) within 14 calendar days after the events giving rise to the complaint occur, unless good cause exists to excuse a delay. *Id.* § DOC 310.07(2). The ICE has the authority to return, investigate, or reject the complaint. *Id.* § DOC 310.10. The inmate may appeal the rejection of the complaint to the appropriate reviewing authority within 10 calendar days. *Id.* § DOC 310.10(10). The reviewing authority shall make a decision within 15 days following receipt of the recommendation or appeal of a rejected complaint. *Id.* § DOC 310.11(1). The reviewing authority's decision is final. An inmate may appeal the reviewing authority's decision within 14 days after the date of the decision by filing a typed or legibly printed request for review with the corrections complaint examiner (CCE). *Id.* § DOC 310.12(1). After reviewing an appeal, the CCE recommends a decision to the DOC Secretary, who adopts or rejects the recommendation. *Id.* §§ DOC 310.12; DOC 310.13. The failure to properly exhaust each step of the grievance process before filing a lawsuit constitutes a failure to exhaust administrative remedies. *Pozo*, 286 F.3d at 1025.

The defendants assert that Jenkins did not exhaust his administrative remedies because he did not file inmate complaints regarding his claim that Adderton and Birdyshaw were deliberately indifferent to his mental health needs. Jenkins does not dispute that he did not exhaust his administrative remedies related to this claim. Instead, he suggests that the administrative process was unavailable to him because the inmate complaint examiner refused to let him file his complaints. The Seventh Circuit has recognized that, "[i]f administrative remedies are not

13

'available' to an inmate, then an inmate cannot be required to exhaust." *Kaba*, 458 F.3d at 684. In this case, the record demonstrates that the complaint office provided Jenkins with information on how to properly exhaust administrative remedies. In addition, Jenkins had properly filed, appealed, and fully exhausted other grievances, including grievances concerning other issues in this lawsuit. In short, the administrative remedies process was not unavailable to Jenkins. The Seventh Circuit has held that a plaintiff's failure to properly exhaust each step of the administrative process constitutes a failure to exhaust available administrative remedies. *Pozo*, 286 F.3d at 1025. Because the grievance process was available to Jenkins and he did not properly exhaust his claim that Adderton and Birdyshaw were deliberately indifferent to his threats of self-harm, the defendants are entitled to summary judgment on this claim.

### B. Excessive Force

Jenkins asserts that Sanchez used excessive force during his transport from HSU to RHU, Kobza used excessive force when he held Jenkins' head and neck back while officers placed him in the restraint chair, Pohl bent Jenkins' wrist when he was placed in the restraint chair, Pohl squeezed his scrotum and penis during the strip search, Pohl maliciously tightened Jenkins' restraints, and Nelson failed to intervene when Sanchez used excessive force. "The Eighth Amendment's Cruel and Unusual Punishments Clause prohibits the 'unnecessary and wanton infliction of pain' on prisoners." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). Not every "malevolent touch by a prison guard" violates the Eighth Amendment. *Hudson*, 503 U.S. at 9. "The use of *de minimis* force, so long as it 'is not a sort repugnant to the conscience of mankind,' is not of Eighth Amendment concern." *Lewis v. Downey*, 581 F.3d 467, 475 (7th Cir. 2009) (quoting *Hudson*, 503 U.S. at 9–10). When the force is more than *de minimis*, however, the primary inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."

14

*See Hudson*, 503 U.S. at 6. In answering this question, the court must consider the following factors: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the officials responsible on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Whitely v. Albers*, 475 U.S. 312, 321 (1986).

On the record before the court, there is no credible evidence that Sanchez and Kobza acted maliciously and sadistically to cause Jenkins harm. The undisputed facts and the video show that Sanchez used a trained technique to transport Jenkins from HSU to RHU because Jenkins was noncompliant and to keep Jenkins and the staff safe. Kobza took over securing Jenkins' head when Jenkins was being placed in the restraint chair. Sanchez and Kobza used reasonable force to maintain discipline, rather than to inflict pain or suffering. There is no evidence of injury other than Jenkins' complaint of pain from the technique utilized by Sanchez and Kobza. No reasonable jury could infer from these facts that these defendants acted with a malicious desire to cause Jenkins harm. And because Sanchez did not use excessive force, Jenkins' claim that Nelson failed to intervene also fails as a matter of law.

Jenkins claims that Pohl bent his wrist backwards when officers placed him in the restraint chair, but Jenkins has not presented any evidence to corroborate his assertion. The video demonstrates that Pohl did not bend Jenkins' wrist and instead, the officers held Jenkins' arms and Jenkins' hands were folded in his lap while other officers placed the restraints on Jenkins. Even if Jenkins' wrist was bent at one point, the Seventh Circuit has explained, "[c]ustodians must be able to handle, sometimes mishandle, their charges, if a building crammed with disgruntled people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable." *Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012). Again, Jenkins has not presented evidence

15

of injury other than his complaint of pain. Jenkins has not provided any evidence from which a reasonable jury could conclude that Pohl acted maliciously while officers restrained Jenkins to the restraint chair. Jenkins also alleged in his complaint that Pohl maliciously tightened his restraints but has not presented any evidence to support that assertion. Accordingly, summary judgment in favor of the defendants as to these claims of excessive force is appropriate.

Jenkins asserts that Pohl squeezed his scrotum and penis during the strip search. A strip search violates the Eighth Amendment when it is "conducted in a harassing manner intended to humiliate and inflict psychological pain." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). In support of his claim, Jenkins asserts that the video shows him reacting when Pohl squeezed his genitals and the officers shoved him against the door to stabilize him. Pl.'s Resp. DPFOF ¶¶ 81, 84. Pohl maintains that he properly conducted the search and used a bladed hand to do so. Construing the facts in the light most favorable to Jenkins, as the court is required to do at this stage, a reasonable jury could infer that Pohl performed the search in a matter designed to humiliate Jenkins, rather than for a legitimate purpose. Therefore, Pohl is not entitled to summary judgment on this claim as a matter of law.

Pohl asserts that he is entitled to qualified immunity. The doctrine of qualified immunity shields government officials from civil liability insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Although qualified immunity is a defense to a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). In order to overcome a defense of qualified immunity, the plaintiff must point to "'a clearly analogous case establishing a right to be free from the specific conduct at issue'" or show "that 'the conduct is so egregious that no reasonable person could have believed that it would not

16

violate clearly established rights.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001)).

Jenkins did not respond to the defendants' qualified immunity argument or point to any cases that find a violation of constitutional rights under analogous circumstances. But if the jury credits Jenkins' version of the facts, the force used by Pohl during the strip search would clearly violate the Eighth Amendment. "Such gratuitous infliction of pain always violates contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment." *Calhoun*, 319 F.3d at 939 (citing *Hudson*, 503 U.S. at 9). "When the qualified immunity inquiry cannot be disentangled from the disputed facts, the issue cannot be resolved without a trial." *Gonzalez*, 578 F.3d at 540 (citation omitted). The qualified immunity analysis in this case is not sufficiently separable from the merits of the case; therefore, Pohl is not entitled to qualified immunity at this time.

### C. Conditions of Confinement

Jenkins asserts that Sanchez left him to sit in his own urine and feces. The Eighth Amendment guarantees prisoners "humane conditions of confinement." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Eighth Amendment can be violated by conditions of confinement in a jail or prison when (1) there is a deprivation that is, from an objective standpoint, sufficiently serious that it results 'in the denial of "the minimal civilized measures of life's necessities,"' and (2) where prison officials are deliberately indifferent to this state of affairs." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (citation omitted). In this case, the undisputed facts establish that Sanchez finished his shift before Jenkins urinated or defecated on himself. In other words, Sanchez cannot be deliberately indifferent to a risk he did not know about. Therefore, the court grants summary judgment in favor of Sanchez on this claim.

17

## D. Deliberate Indifference

Jenkins claims that Kacyon, Engstrom, Jensen, and Captain Theander were deliberately indifferent to his serious medical needs when they ignored his complaints of painful, ripped skin. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer*, 511 U.S. at 832. A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. To prove a claim of deliberate indifference, the plaintiff must "establish that [he] suffered from an 'objectively serious medical condition' and that the 'defendant was deliberately indifferent to that condition.'" *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)).

As an initial matter, the defendants assert that Jenkins has failed to establish the existence of a serious medical need. What constitutes a sufficiently "serious medical need" is "far from self-defining." *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). A condition may be sufficiently serious where failure to treat the condition could "result in further significant injury or the unnecessary and wanton infliction of pain" or where the injury is one that "a reasonable doctor or patient would find important and worthy of comment or treatment." *Id.* "It is clear that the Supreme Court contemplated that medical conditions far less critical than 'life threatening' would be encompassed by the term." *Id.* Although Jenkins alleges he had "painful ripped skin" the record reflects that his arms had a mere skin abrasion. These injuries were not objectively serious ones to which the medical staff were recklessly indifferent. *See Hinson v. Bias*, 927 F.3d 1103,

18

1122 (11th Cir. 2019) (finding that mere skin abrasions and bruising do not rise to the level of a serious medical need requiring immediate treatment); *Willis v. Scrogum*, No. 04-1413, 2006 WL 2597889, at *6–7 (C.D. Ill. Sept. 8, 2006) (prisoner did not demonstrate objectively serious medical need when he had abrasions on his forehead, cheeks, and lower lip).

In any event, Jenkins did not demonstrate that the defendants were deliberately indifferent to his medical needs. Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendant knew of, yet disregarded, an excessive risk to the plaintiff's safety. *Farmer*, 511 U.S. at 825, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted). The defendants routinely checked on Jenkins while he was in restraints, and the medical defendants provided treatment once he was released from the restraints. Jenkins' treatment included cleaning the abrasions and wrapping them with a bandage. To the extent Jenkins claims he suffered a delay in treatment, he must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007) (citing cases). Jenkins has not provided "medical evidence that tends to confirm or corroborate that the delay was detrimental." *Id.* Therefore, these defendants were not deliberately indifferent, and the court will grant summary judgment on this claim.

## CONCLUSION

For these reasons, the defendants' motion for summary judgment (Dkt. No. 39) is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is denied with respect to Jenkins' claim that Pohl's strip search of Jenkins violated his constitutional rights but granted with respect

19

to the remaining claims. Jenkins' claims against Adderton and Birdyshaw are dismissed without prejudice for failure to exhaust administrative remedies. Kacyon, Jensen, Sanchez, Nelson, Theander, Kobza, Birdyshaw, Engstrom, and Adderton are dismissed as defendants. The Clerk is directed to set the matter on the court's calendar for further scheduling.

**SO ORDERED** at Green Bay, Wisconsin this 17th day of August, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge
